# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| LEADING MANUFACTURING SOLUTIONS, LP,<br><br>　　　　　　　　　　Plaintiff,<br><br>　vs.<br><br>HITCO, LTD., et al.,<br><br>　　　　　　　　　　Defendants. | CASE NO. 15cv1852-LAB (PCS)<br><br>**ORDER GRANTING IN PART AND DENYING IN PART MOTION FOR SUMMARY JUDGMENT** |

After Plaintiff Leading Manufacturing Solutions, LP ("LMS") discovered the two New York corporations named as Defendants were insolvent, it filed a third amended complaint ("TAC") naming their shareholder Theodore Smith, Jr. as a Defendant under an alter ego theory, and also bringing a fraud claim against Smith directly.

**The Motion**

Smith moved for summary judgment. That motion is fully briefed and the Court is now prepared to rule on it.

Although LMS did not move for summary judgment, its opposition to Smith's motion asked the Court to find Smith liable to LMS as a matter of law. But summary judgment is ordinarily requested by motion. Smith was not required to, and did not, address LMS's informal request for summary judgment in his reply brief. Although the Court is permitted to grant summary judgment independent of a motion, notice and an opportunity to respond are

required. *See* Fed. R. Civ. P. 56(f). Because Smith has not had notice, and there is no obvious reason for granting summary judgment in LMS's favor, this order deals only with Smith's motion.

**Background**

LMS is a partnership with its principal place of business in this District. Its partners are all California citizens. The two corporate Defendants, Hitco, Ltd. and Hitco, Inc., both have their principal places of business in New York, though LMS argues they are not actually legally-existing corporations. Smith is a citizen of New York.

LMS claims Smith knew the two corporations were undercapitalized, and that he was using them as a mere shell for his own personal purposes. LMS claims he intermingled his and the two corporations' assets, and that corporate formalities were not observed. It also claims Hitco, Ltd. had ceased its corporate existence before it (or Smith, acting through it) engaged in the activities giving rise to LMS's claims.

According to LMS, Smith caused the corporations to enter into purchase agreements with LMS, knowing the corporations could not pay. LMS argues that Smith knowingly misrepresented the corporations' status to outsiders, including falsely suggesting the corporations were large and healthy and had offices around the world that were staffed with local employees. LMS claims Smith selectively paid creditors when it was in his interest to do so.

LMS alleges that Hitco, Inc. purportedly obtained a patent for a product called the Smart Clamp, which it transferred for no consideration to Hitco., Ltd. Hitco, Inc. is also alleged to be the owner of a patent for a product called the Sani-Lock. LMS alleges that Smith, acting under the auspices of the Hitco corporations, asked LMS to produce two versions of the Smart Clamp, all the while offering LMS assurances of the corporations' viability. LMS, acting on the basis of his representations, expended money and effort to produce the products that were ordered, but was not paid.

The TAC does not allege specific dates for most of these events, but they cover the time period from roughly 2010 to early 2015. The purchase order is dated August 22, 2011.

**Legal Standards**

Courts are split on whether there is a right to a jury trial on the issue of piercing the corporate veil under an alter ego theory. *See United States v. Vacante*, 2010 WL 2219405 at *3 (E.D. Cal., June 2, 2010). *See also Logtale, Ltd. v. IKOR, Inc.*, 2015 WL 12942493 at *1 (N.D. Cal., Dec. 1, 2015) (submission of alter ego question to the jury was proper). But Smith's brief treats it as a jury question, subject to the usual summary judgment standards, and LMS's brief does not address the issue. The Court's working assumption is that, unless summary judgment is granted, the question will be submitted to a jury.

Summary judgment is appropriate if the evidence shows that there is "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The movant bears the burden of showing that summary judgment is proper. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970). If that burden is met, the burden shifts to the opposing party to establish through specific facts that there is a genuine issue of material fact. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). When ruling on a motion for summary judgment, the Court looks to evidence; mere allegations or arguments are not sufficient to withstand a motion for summary judgment. *Id*. Arguments in the briefing must be supported by specific citations to evidence; the Court is not required to search through the exhibits to find it. *Orr v. Bank of America*, 285 F.3d 764, 775 (9th Cir. 2002) (holding that failure to cite page and line numbers of exhibits offered in opposition to motion for summary judgment warranted court's exclusion of that evidence); *Forsberg v. Pacific N.W. Bell Tel. Co.*, 840 F.2d 1409, 1418 (9th Cir.1988) (holding a district court is "not required to comb the record to find some reason to deny a motion for summary judgment").

The evidence of the non-moving party is to be believed, and all reasonable inferences that may be drawn from the facts must be drawn in favor of the opposing party. *Anderson*, 477 U.S. at 255. The Court does not weigh the evidence or resolve disputed issues of fact. *Id*. at 249. Rather, the Court's role is to determine whether there is a genuine issue of

///

material fact for trial. *Id*. Disputes about immaterial facts do not preclude summary judgment. *Lynn v. Sheet Metal Workers' Intern. Ass'n*, 804 F.2d 1472, 1483 (9th Cir.1986).

Because the Court is sitting in diversity, it applies California substantive law. *See Mazza v. Am. Honda Motor Co.*, 666 F.3d 581, 589 (9th Cir. 2012).

**Arguments and Analysis**

Smith argues that under the California's "internal affairs" doctrine, only one state should be permitted to regulate a corporations internal affairs, and usually this will be the state of its incorporation. For this reason, he argues, New York law should be applied to determine whether he can be personally liable. LMS contends that the "internal affairs" doctrine is inapplicable here. Both parties, however, argue that under either New York or California law, they are entitled to prevail on this issue.

The Court agrees that New York law governs Smith's personal liability, assuming Hitco, Ltd. is treated as a corporation. Nevertheless, the application of either state's law leads to the same result.

**Alter Ego: Legal Standards**

Ordinarily, corporations and their shareholders are considered distinct entities. *Dole Food Co. v. Patrickson*, 538 U.S. 468, 474 (2003). Disregarding that distinction through corporate veil-piercing or alter ego theory is a ""rare exception, applied in the case of fraud or certain other exceptional circumstances . . . ." *Id*. at 475.

Under California law, two conditions must be met before the alter ego doctrine will be applied. First, there must be such a unity of interest and ownership between the corporation and its equitable owner that the separate personalities of the corporation and the shareholder do not in reality exist. *Sonora Diamond Corp. v. Superior Ct.*, 83 Cal. App. 4th 523, 538 (Cal. App. 5 Dist. 2000). Second, there must be an inequitable result if the acts in question are treated as those of the corporation alone. *Id.* A number of factors are considered when deciding whether there is a unity of interest, including commingling of funds, one entity's holding itself out as liable for the other's obligations, identical ownership, use of the same offices and employees, use of one as a mere shell or conduit for the other,

inadequate capitalization, disregard of corporate formalities, a lack of segregation of corporate records, and identical directors and officers. *Id*. at 538–39. Obviously, some of these factors are more likely to be relevant when one corporation is accused of being the alter ego of another corporation rather than an individual. No one factor is dispositive; courts must look at all the circumstances to determine whether alter ego applies. *Id*. at 539.

The fact that an obligation will remain unpaid if the corporate form is upheld is not by itself an inequitable result that justifies application of the alter ego doctrine. *See Mid-Century Ins. Co. v. Gardner*, 9 Cal. App. 4th 1205, 1213 (Cal. App. 3 Dist. 1992). Rather, some conduct amounting to bad faith or fraud must render recognition of the corporate form inequitable. *Id*.

Under New York law, courts are empowered to disregard the corporate form when necessary "to prevent fraud or achieve equity." *Walkovsky v. Carlton,* 18 N.Y.2d 414, 418 (1966). "The determinative factor is whether 'the corporation is a "dummy" for its individual stockholders who are in reality carrying on the business in their personal capacities for purely personal rather than corporate ends." *Port Chester Elec. Const. Co. v. Atlas*, 40 N.Y.2d 652, 657 (1976) (quoting *Walkovsky,* 18 N.Y.2d at 418). Another formulation of this same rule is that the corporate form may be disregarded where the owner exercised "complete domination over the corporation with respect to the transaction at issue," and that this domination was used to defraud or wrong the plaintiff. *Am. Fuel Corp. v. Utah Energy Development Co., Inc.*, 122 F.3d 130, 134 (2d Cir. 1997). Factors considered include "an overlap in ownership, officers, directors and personnel, inadequate capitalization, a commingling of assets, or an absence of separate paraphernalia that are part of the corporate form . . . such that one of the corporations is a mere instrumentality, agent and alter ego of the other. . .") *John John, LLC v. Exit 63 Development, LLC*, 826 N.Y.S. 2d 657, 659 (N.Y.Sup. Ct. 2006). Some other factors are failure to observe corporate formalities, putting in or taking out funds from the corporation for personal purposes; the sharing of office space, address, and phone numbers; a lack of arm's-length dealing with the corporation; and

*/ / /*

payment or guarantee of corporate debt by others. *See William Passalaqua Builders,* et al. *v. Resnick Developers S., Inc.*, et al., 933 F.2d 131, 139 (2d Cir. 1990).

**Alter Ego: Undisputed Facts**

The parties agree on 25 undisputed facts:

1. Hitco, Ltd. was formed as a Corporation in the State of New York on July 19, 1983.

2. Hitco, Ltd. was dissolved by proclamation by the State of New York on June 15, 1988.

3. The dissolution of Hitco, Ltd. was annulled on January 30, 2012.

4. Hitco, Inc. was formed as a Corporation in the State of New York on September 18, 2007.

5. Hitco, Inc. acquired the "Sanitary Quick connector" (Sani Lock) patent in May 2008 from George Carmichael.

6. Inventors John Morton and Daniel Gentle assigned the Smart Clamp patent to Hitco, Inc. on November 24, 2010.

7. Hitco, Inc. assigned the Smart Clamp patent to Hitco, Ltd. on May 30, 2012.

8. The 100,000 piece Purchase Order known as HIT-0646 was placed on August 22, 2011.

9. On August 22, 2011, Theodore B. Smith, Jr. was aware that Hitco, Ltd. had been dissolved on June 15, 1988.

10. At the time the 100,000 piece Purchase Order known as HIT-0646 was placed, Hitco, Ltd. did not own the Smart Clamp.

11. Hitco, Inc. never made a profit in any year of its existence.

12. After 2006, Hitco, Ltd. never made a profit.

13. Hitco, Ltd. paid expenses of Hitco, Inc. after 2010.

14. Hitco, Inc. distributed losses to Theodore B. Smith, Jr. on Schedules K-1 in every year of its existence.

15. Hitco, Ltd. distributed losses to Theodore B. Smith, Jr. on Schedules K-1 in every year after 2006.

16. Hitco, Ltd. never had an office in New Hampshire.

17. Hitco, Ltd. never had an office or manufacturing plant in Japan.

18. Hitco, Ltd. never had an office or manufacturing plant in Taiwan.

19. Hitco, Ltd. never had employees in countries other than the United States.

20. Hitco, Ltd. never had an office in any country other than the United States.

21. Neither Glenn Davis nor anyone else on behalf of Plaintiff LMS ran a Dun & Bradstreet report on Hitco, Ltd. or Hitco, Inc. prior to the time the instant lawsuit was filed.

22. Hitco, Ltd. and Hitco, Inc. are located in the same office suite, in Oyster Bay, New York.

23. Hitco Ltd. alone pays the rent for the office space it shares with Hitco Inc.

24. Hitco, Ltd. and Hitco, Inc. have had, and share, only two employees, Marie Altimari and Carol Carrieri, since 2010.

25. On January 31, 2013, Theodore B. Smith, Jr. personally guaranteed a renewed $110,000 line of credit for Hitco Ltd.

(Jt. Stmt. of Undisputed Facts (Docket no. 90-1).)

**Alter Ego: Evidence**

Each party supports its position with an expert witness report or declaration. Smith offers the report of forensic accountant Tiffany Tso, who concluded that the two corporate entities were not alter egos of each other or of Smith.[1] LMS offers the report of forensic accountant Heather H. Xitco, who outlined factors she believed pointed to their being alter egos. While neither has yet been qualified as an expert in this case, both at least are accountants and may qualify. LMS argues that Tso's report will be inadmissible at trial. Tso argues that certain of Xitco's opinions are unfounded.

The record evidence is fairly straightforward. Hitco, Ltd. was dissolved by the state of New York in 1988, and at the time the purchase order was placed, was not a corporation in good standing. It apparently continued to be operated as a corporation, though it is unclear for how long or whether such operation was continuous.[2] It was reinstated January 30, 2012. Under New York law, he argues, all contracts entered into during its period of dissolution were validated at that time. This argument is consistent, to a point, with the holding of *Nigro v. Dwyer*, 438 F. Supp. 2d 229 (S.D.N.Y. 2006), which Smith cites and relies

---

[1] The Court looks primarily to the bases for Tso's opinion. Her conclusion, by itself, is not evidence.

[2] Smith offers evidence that Hitco, Ltd. operated as a Subchapter S corporation starting March 12, 1998. (Decl. of Daniel J. Pautz at 2 (Docket no. 86-3 at 5).)

on. That case discusses three cases from the Second Circuit, *L-Tec Electronics Corp. v. Cougar Electronic Org., Inc.*, 198 F.3d 85 (2d Cir. 1999), *Prentice Corp. v. Martin*, 624 F. Supp. 1114 (E.D.N.Y. 1986); and *Held v. Crosthwaite*, 260 F. 613 (2d Cir. 1919). Although Smith is correct as to the general rule, there is an exception where a defendant acted fraudulently or in bad faith. *Nigro*, 438 F. Supp. 2d at 236–37. Where there is "a disputed issue of material fact concerning the *bona fides* of defendant's conduct, summary judgment is properly denied. *Id*.

Under New York law, Hitco, Ltd. was a corporate entity from January of 2012 onward. Under *Nigro*, however, that does not answer the question of whether Hitco, Ltd. should be treated as a corporation for purposes of limiting Smith's personal liability. That question is bound up with the question of whether Smith acted fraudulently — or at least in bad faith. Because fraud or bad faith is an element of the alter ego analysis, the Court need not reach this question yet. That being said, the timing in this case is different from most. In the cases *Nigro* discusses, which appear to be typical, corporations are reinstated a few years after dissolution. Here, Hitco, Ltd. was dissolved in 1988 and reinstated over twenty years later, after Hitco, Ltd. had entered into the purchase agreement.

LMS points to a lack of other corporate formalities, such as corporate minutes or resolutions, minutes of director meetings. Although both corporations have two shareholders (Smith being the majority shareholder in both), no shareholder meetings were ever held. Since 2010, Smith has owned 94.75% of Hitco, Ltd. while Carol Ann Carrieri (an employee of both companies) has owned the remaining 5.25%. Since 2010, Smith has owned 86% of Hitco, Inc., while George Carmichael has owned the remaining 14%. Carmichael, the former owner of the Sani Lock patent, acquired his interest as part of a deal by which Hitco, Inc. acquired the patent.

LMS identifies both corporations' alleged undercapitalization as a factor to be considered. Smith points to his expert's opinion that both corporations were adequately capitalized, given their history and business model which involved relatively low expenses, and that at the time of the purchase order, Hitco, Ltd. had a favorable debt to equity ratio.

He also argues that they were both adequately capitalized at the time of incorporation. He offers his own expert's opinion that infusions of capital and loans he made to the companies were normal and properly accounted for. A finder of fact is not required to accept these characterizations, however, particularly because there is some evidence to the contrary.

As noted, Hitco, Ltd. was originally incorporated in 1988. Its corporate status lapsed because of nonpayment of franchise taxes. It continued to operate as a corporation after that time, though, and during that time it entered into the purchase agreement. It then paid the back taxes and the state of New York reinstated it in 2012. Smith's argument about the capitalization of Hitco, Ltd. does not take into account these circumstances, and he does not cite authority showing which of the two dates — its initial incorporation in 1988 or its reinstatement in 2012 — is the operative date. And in any event, it entered into the purchase agreement at a before its reinstatement.

Smith's expert relies on Hitco, Inc. being capitalized in 2008 with $27,500 plus the "Sanitary Quick Connector" patent and a trademark for "Sani-Lock". (Pautz Decl. at 4.) Smith's expert characterizes this infusion of cash, and another in 2011 (in the form of a loan from Smith) as normal and properly accounted for. (Pautz Decl. at 5.) Smith argues the loans were arm's-length transactions. But circumstances and the documentation could lead a finder of fact to decide otherwise. As LMS points out, the only documentary evidence of this is a promissory note signed by Smith (in his capacity as each corporation's representative) in 2015, with the interest that accrued between 2011 and 2015 not capitalized. Although LMS does not press the point, Smith has relied on the fact that the corporations' credit rating was not high.[3] A reasonable trier of fact could conclude that an unsecured loan on such favorable terms, reduced to writing several years later, was not an

///

---

[3] Smith, at his deposition, testified that the Dun & Bradstreet report disclosed the Hitco entities' poor credit rating, and he knew this because he had pulled the report himself. (Pautz Decl., Ex. D at 8 (Smith Depo. Tr. at 79:19–23).) But he was unable to say when he had done this. (*Id.*) Davis, at his deposition, also testified that he looked at the Dun & Bradstreet report on the Hitco entities later, he saw the recommended credit line was just $2,500. (Pautz Decl., Ex. F at 8 (Davis Depo. Tr. at 330:23–25).)

arm's length transaction and instead represented Smith personally propping up the two corporations with his own money.

LMS's expert, Xitco, concluded that "It is abundantly clear that without the constant infusion of cash from Mr. Smith, neither entity could continue to exist." (Pautz Decl. at 9 (quoting Xitco report).) Tso responds with the observations:

> The infusion of cash from an owner is the only way to keep a company in business if it is generating losses and has no access to third party financing. The funds were contributed in anticipation of the successful turnaround of the companies, such as via the marketing of the Sani-Lock and SmartClamp products. This is a normal business practice for companies experiencing operating losses.

(*Id*.) While "normal business practice" is one way to characterize it, the Court must view the evidence in the light most favorable to LMS. Viewed in that light, the two companies could be seen as not creditworthy and operating at such a constant loss that they had become insolvent. Viewed this way, the only way for them to remain in business was for their principal shareholder, Smith, to pay their expenses personally. A creditor dealing with the corporations at arm's length, it could be inferred, would demand security, a more creditworthy cosigner, a better rate of return, and/or other more favorable terms, and would have memorialized the loan in writing before handing over any money. The parties also agree that Smith personally guaranteed a $110,000 Bank of America line of credit for Hitco, Ltd. on January 31, 2013. (*See* Vaughn Decl., Ex. 15.)

A good deal of the remaining evidence comes in the form of testimony, and potentially raises problems with credibility, weight, and evaluation. At this stage, the Court views all evidence in the light most favorable to the non-moving party, *i.e.*, LMS. Although the Court has reviewed the evidence, only a summary discussion is necessary here.

LMS points out that both corporations share an office, the same two employees, and the same phone number, which is answered simply "Hitco". (Vaughn Decl., Ex. 8 at 120:24–121:9.) Their accounting records are kept on the same computer system, and there is some evidence they shared operating expenses and have shared funds or expenses without formally documenting it. There is also evidence the corporations' employees perform

significant work for Smith in his personal capacity and funds have been used for Smith's personal benefit, at least to some extent. The parties agree Hitco, Ltd. has been paying Hitco, Inc.'s business expenses.

In general, the evidence suggests that the two corporations were fairly small and not particularly active businesses, which to an extent explains the informality and lack of certain records. Viewing this in Smith's favor, it made business sense to run them this way. But viewing the evidence in the light most favorable to LMS, as the Court must do, the same evidence could support a finding that the two corporations were in fact extensions of each other and of Smith. Viewed in this way, it could also support an inference that more thorough record keeping would have disclosed some blurring of the lines.

In short, viewing the evidence in the light most favorable to LMS, a reasonable trier of fact could find a unity of ownership and control among Hitco, Ltd., Hitco, Inc., and Smith—or, alternatively, that each corporation was a "dummy" for Smith. But even assuming LMS can prove this, the question of fraud, bad faith, or inequity remains.

**Fraud Claim**

The elements of a fraud claim are similar though not identical in New York and California. *Compare Loreley Fin. (Jersey) No. 3 Ltd. v. Wells Fargo Sec., LLC*, 797 F.3d 160, 170 (2d Cir. 2015) and *Vess v. Ciba-Geigy Corp. USA*, 317 F.3d 1097, 1105 (9th Cir. 2003). Both include a knowing material omission or misrepresentation of fact with an intent to induce reliance or to defraud, justifiable reliance, and resulting damages. *See id.* In both New York and California, a misrepresentation is material if there is a substantial likelihood a reasonable person would have considered it important in deciding what course to pursue. *See Weinstat v. Dentsply Int'l, Inc.*, 180 Cal. App. 4th 1213, 1223 (Cal. App. 1 Dist. 2010); *2 Fifth Ave. Tenants Ass'n v. Abrams*, 583 N.Y.S.2d 466, 567 (N.Y. App. 1992).

The TAC alleges that, in response to Smith's request and in reliance on his expressions of interest in ordering Smart Clamps, LMS personnel invested significant time and effort to determine whether they could fill such an order. (TAC, ¶¶ 15–18.) These allegations are specific with regard to what LMS did, though they do not mention dates.

Smith's inducing LMS to expend effort and resources to determine whether LMS could fill such an order does not appear to be part of LMS' fraud claim. The heart of the claim is Smith's representations to LMS that were intended to, and did, induce LMS to enter into the purchase agreement.

The alleged misrepresentations include the statement that Hitco, Ltd. owned the Smart Clamp patent, when in fact Hitco, Inc. owned the patent and Hitco, Ltd. was not (at the time) a validly-existing corporation at all. (TAC, ¶¶ 17–18.) At the time, Hitco, Inc. had not assigned the patent to Hitco, Ltd. (*Id.*, ¶ 18.) At Smith also allegedly misled LMS with representations that the two corporations were multinational concerns with offices and employees in several different countries, when in fact it had two employees and a small leased office in New York. (*Id*, .¶ 17.) Smith and the corporations then apparently attempted to assign to a third company called Rubber Fab the rights to take delivery of the products and to distribute them on the corporations' behalf. (*Id*., ¶¶ 21–22.) Smith characterizes this as brokering the deal, which he says is the corporations' normal business model. Rubber Fab, apparently was dissatisfied with the design, so the corporations reassumed responsibility and promised again to pay for the clamps. (*Id*., ¶¶ 23–24.)

As outlined in the TAC, the claim is premised on allegations that Smith, who never intended to pay for the clamps, nevertheless induced LMS to enter into a purchase order with Hitco, Ltd. (TAC, ¶ 32–39.) As a result, LMS alleges, it lost over $1 million. (TAC, ¶ 38.)

Under Fed. R. Civ. P. 9(b), facts giving rise to a fraud claim must pled specifically enough to give a defendant notice of the particular misconduct, and must be accompanied by "the who, what, when, where, and how" of the charged misconduct. *Kearns v. Ford Motor Co.*, 567 F.3d 1120, 1124 (9th Cir. 2009) (quoting *Vess*, 317 F.3d at 1106) (further citations omitted).

The TAC is thinly pled, and does not meet this standard. But in support of its opposition, LMS provides the declaration of Glenn Davis, who attests to representations that the corporations, Smith, and their representatives made to him, and surrounding events. This declaration is detailed as to the source of the representations, the time and place they

were made, and other circumstances surrounding them. While these facts are not treated as part of the complaint for pleading purposes, they are considered when deciding whether to grant leave to amend. *See Schneider v. Cal. Dep't of Corr. & Rehab.*, 151 F.3d 1194, 1197 n.1 (9th Cir. 1998).

Some of the representations, even if knowingly false, do not support a fraud claim. For example, Smith's remark to Davis that his business was "doing very well" and similar remarks, standing alone, are at most mere puffery. (Davis Decl., ¶ 14.) Under either New York or California law, predictions about future events or remarks about plans, are not fraudulent, unless Smith or one of the other representatives knew they were false at the time they were made. *See Cronos Group, Ltd. v. XComIP,* LLC, 64 N.Y.S.3d 180, 193 (N.Y. App. Div. 2017) (citing cases); *Richard P. v. Vista Del Mar Child Care Serv.*, 106 Cal. App. 3d 860, 865 (Cal. App. 2 Dist. 1980). Similarly, under either state's law unfulfilled promises to pay ordinarily support only a breach of contract claim, and are not fraudulent unless Smith or another representative never intended to pay. *See Tenzer v. Superscope, Inc.*, 39 Cal.3d 18, 30 (1985); *Pope v. N.Y. Prop. Ins. Underwriting Ass'n*, 66 N.Y.2d 857, 857 (1985).

The alleged circumstances do not reasonably suggest that Smith intended not to pay LMS at the time the deal was entered into. Among other things, Hitco, Ltd. had signed an agreement with Rubber Fab, and as a result had reason to believe it would have the money to pay LMS.[4] They may imply that Smith intended to assign certain rights and responsibilities to Rubber Fab. Here, the circumstances suggest that Rubber Fab backed out because of unforeseen complications, leaving the corporations in a position they had not foreseen—namely, that payment would come due without their having a buyer or distributor.

Statements about Hitco, Ltd.'s corporate status and about ownership of the patent are probably not material misstatements here. Correcting both of them required compliance with some formalities that Defendants apparently could and did carry perform. And even if they

/ / /

---

[4] Before entering into the purchase agreement, LMS was told about the agreement between Hitco, Ltd. and Rubber Fab. (Decl. of Glenn Davis, ¶¶ 6, 9, 11–12.)

were technically false, the falsity was effectively remedied and rendered harmless by later events. That being said, representations implying that Hitco, Ltd. has been in continuous operation since 1983 may be material.

The only part of the allegations that could support a fraud claim are representations regarding the corporations' creditworthiness, operations, substantial resources, and financial stability. One of these is a statement on the corporate website that Davis consulted at the time he was meeting with Smith, falsely claiming that Hitco, Ltd. was a corporation with numerous employees and a worldwide reach:

> HITCO LTD's six offices around the world is [sic] staffed by multi-lingual personnel, native to their countries, which will facilitate your communications requirements and will act as your offshore buying representatives . . . .

(Davis Decl., Ex. 2; see also id., Ex. 1 (giving a shorter version of the same representation).) Another page lists the "World Headquarters" as being in New York, "Sales Engineering" as being in New Hampshire, and "Manufacturing" facilities as being in Taiwan and Japan. (Id., Ex. 3.) This information is apparently addressed to potential business partners, clients, or customers.

The "Welcome" page emphasizes Hitco, Ltd.'s global presence, network, and capacity. (See Davis Decl., Ex. 1.) It is explicitly addressed to potential business contacts, and assures them of Hitco, Ltd.'s superior management ability, international contacts, and expertise:

> **HITCO LTD WORLDWIDE SALES AND SOURCING** was established on June 1, 1983. Our products and global service is [sic] balanced by a wide range of knowledge in tooling, and cost effective manufacturing of high quality products. We also have an excellent record managing our clients' inventories, international warehousing, local deliveries, and the paperwork associated with multiple vendor programs.
>
> In addition, we developed a network of contacts and sources, so you our clients can enjoy the benefits of international sources without experiencing long lead times, larger than needed minimum order requirements, international letters of credit, and all the other documents associated with international commerce.

(Id.) These representations could be taken as assurances of Hitco, Ltd.'s ability to help clients navigate the international market, which is not at issue in this case. But viewing the

evidence in the light most favorable to LMS, it is reasonable to infer that by putting this information on its website, Hitco, Ltd. intended to persuade people to do business with it, by misleading them about the scale of its operations, and its history, stability, and resources.

Smith argues that what Hitco, Ltd. said on its website is material unless it was intended or reasonably expected that LMS would contract with him or the corporations on the basis of the website. But the requirements are not as narrow as Smith suggests. Hitco, Ltd.'s public website is the kind of public representation that a potential business partner, customer, or investor could reasonably be expected to look at and rely on. *See In re Windsor Plumbing Supply Co., Inc.*, 170 B.R. 503, 529 (Bankr. E.D.N.Y. 1994) (holding that misrepresentation can support a fraud claim if there was reason to expect that the misrepresentation would reach either that particular plaintiff *or* a class of persons including the plaintiff). *See also Last Atlantis Capital LLC v. AGS Specialist Partners*, 749 F. Supp. 2d 828, 834 (N.D. Ill. 2010) (noting implicit agreement among courts that it investors may reasonably be expected to read and rely on statements on company websites). Smith cites authority for the proposition that a potential business partner is expected to do due diligence before entering into a transaction. Gathering information from a company's public website would seem to be a component of this.

Furthermore, at a 2011 meeting in New York, Davis says Smith affirmed these representations, in part, by saying he had a manufacturing company in Japan and a distribution channel in Europe. (Davis Decl., ¶ 14.) Davis implies, but does not expressly say that Smith was referring to one or both of the corporations, as opposed to some side enterprise. Davis also says that Smith omitted to mention that the corporations were insolvent. This omission, combined with the mention of facts to suggest a financially robust business, could have given the impression that Hitco, Ltd. would be able to satisfy any financial obligations that arose. It also suggests other characteristics, such as the capacity to marshal resources and to respond to challenges quickly and effectively.

Davis also says that Smith promised his company would enter into a ten-year exclusive manufacturing agreement with LMS, to include both the Smart Clamp and Sani-

Lock products. (Davis Decl., ¶ 12.) LMS would likely have expected Hitco, Ltd. to realize income from the Rubber Fab deal. The facts do not suggest that LMS would be looking primarily to the assets of Smith or either of the corporations for payment, because Davis knew about the parallel ten-year agreement between Hitco, Ltd. and Rubber Fab. (*Id.*) Even so, knowing that there was some assurance of payment if the deal fell through would be important to a reasonable company in LMS's position.

A reasonable person in LMS's position would want to know what kind of a company it was doing business with. It likely would make a difference to potential business partners whether they were dealing with a large corporation that had international offices, manufacturing and other facilities, and numerous employees; or a small corporation that did little more than broker deals and had two employees in one office. In other words, misrepresentations intended to give business partners or customers the impression that Hitco, Ltd. and/or Hitco, Inc. was a large, robust, and active business concern with a global reach and significant resources are likely to be material.

Whether LMS's reliance was reasonable is a question of fact that cannot be resolved at this point. Any information LMS might have uncovered by checking on Hitco, Ltd.'s creditworthiness before entering into the agreement is speculative; the only evidence the parties refer to is evidence that appeared in Dun & Bradstreet some time later. Furthermore, there is at least some evidence that a company in LMS's position would not routinely check into the financial viability of its business partners or customers before entering into a deal like this. (*See* Pautz Decl., Ex. F at 21 (Davis Depo. Tr. at 326:9–14).) This is further supported by evidence suggesting that the parties believed Hitco, Ltd. had a source of income, namely its deal with Rubber Fab. Hitco, Ltd.'s creditworthiness might be material, but not of primary importance.

Finally, even if LMS cannot prove fraud, so as to hold Smith liable either directly or under an alter ego theory, it may still be able to prove bad faith, which would be enough to hold Smith liable under an alter ego theory.

/ / /

**Conclusion and Order**

As it stands, the TAC does not adequately plead fraud and does not adequately plead facts showing that Smith can be liable to LMS either directly or under an alter ego theory. Smith's motion is **GRANTED IN PART**. If LMS can in good faith correct the fraud allegations to allege material misrepresentations about the two corporations' financial status and to establish other elements of fraud, it should file a fourth amended complaint doing so, within 21 calendar days of the date this order is issued. Otherwise, the claims can go forward against Hitco., Inc. and Hitco, Ltd. on a breach of contract claim only. In all other respects, Smith's request for summary judgment is **DENIED**.

A number of documents filed in connection with this motion were not electronically searchable. Because the briefing amounted to over six hundred pages, this resulted in significant delay. In future, the parties are ordered to file documents produced electronically, rather than printed and then scanned. (*See* CM/ECF User's Manual for the Southern District of California, at 6.)

**IT IS SO ORDERED**.

DATED: March 19, 2018

*[signature]*

**HONORABLE LARRY ALAN BURNS**
United States District Judge