# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF CALIFORNIA

| LEADING MANUFACTURING SOLUTIONS, LP,<br><br>               Plaintiff,<br><br>v.<br><br>HITCO, LTD., et al.,<br><br>              Defendants. | Case No.: 15cv1852-LAB (BGS)<br><br>**FINDINGS AND JUDGMENT FOLLOWING BENCH TRIAL** |
|---|---|

With the parties' consent, this case was tried to the Court without a jury. The Court made findings, ruled on motions, and announced its verdict from the bench on the record. At the same time, the Court announced its intent to issue a supplemental follow-on written order. This Order is intended as a final and definitive summary and memorialization of the Court's determinations and rulings at trial, as well as a supplement to them.

The Court made several rulings leading up to trial, and these rulings helped shape the issues for trial. In particular, the pretrial order set forth factual and legal issues to be tried. Also, before trial, the parties stipulated to a number of facts. Other facts, while not stipulated to, were undisputed at trial and implicitly accepted by the Court. In particular, the Court accepted the parties' stipulation that Hitco,

Ltd.'s and Hitco, Inc.'s corporate status (including the alter ego theory) would be governed by New York law, while the claims and affirmative defenses would be governed by California law.

This Order includes factual findings together with legal conclusions. The Court's factual findings are based on the evidence presented at trial, including admitted exhibits, as well as the parties' stipulations. The Court also had the opportunity to observe the witnesses' demeanor and its factual findings are, to some extent, based on how witnesses testified. Finally, these findings are also based on reasonable factual inferences the Court has drawn from the evidence. Some exhibits were not admitted, and the Court has not relied on those. That said, many of them were referred to by witnesses either directly or indirectly, and the Court relies, in part, on that testimony.

**Motions at the Close of Plaintiff's Evidence**

After Plaintiff Leading Manufacturing Solutions ("LMS") rested, Defendants Hitco, Ltd.; Hitco, Inc.; and Theodore Smith moved under Fed. R. Civ. P. 52(c) for judgment in their favor on all issues. The Court granted that motion in part.

The Court found for Defendants as to the Sani-Lock claims. Specifically, the Court found that the parties had not entered into a written or oral contract involving LMS's manufacture of this device. In particular, many of the central terms were never agreed on. The Court determined, however, that representations made in the course of negotiations concerning the Sani-Lock could and would be considered in support of LMS's fraud claim.

The Court also found for Defendants as to LMS's claim based on a ten-year exclusive manufacturing agreement for the Smart Clamp device. The purported contract, as LMS conceives it, would have bound Defendants and the company known as Rubber Fab to order the same number of Smart Clamps over the next ten years. While there was an exclusivity agreement between Hitco, Ltd. and Rubber Fab (Ex. 143), it did not contemplate orders of a particular number of units

over time. From a commercial standpoint, such a standing order would have made little sense. If demand increased, Defendants and Rubber Fab would have been unable to meet it. And if demand fell off because of unforeseen factors (which in fact happened), Defendants and Rubber Fab would have committed themselves to a recurring order of the unwanted and unsellable products for the next ten years. It's not plausible that Defendants would have agreed to this. Instead, it's much more plausible that they would have agreed to a "requirements" contract, though there was no evidence negotiations got that far.

Furthermore, even supposing there were a ten-year contract, damages would be speculative. The product orders and profit margins that LMS based its damages calculation on depended on sales projections, and predictions about costs far in the future. The evidence made clear that costs could and did rise, as Defendants requested adjustments to the Smart Clamp to improve it and correct what customers had identified as defects.

The Court denied the motion as to LMS's alter ego theory and Defendants' suggestion that there had been a novation as a result of which Defendants were no longer in any contractual relationship with LMS.

**Findings and Verdict**

After both parties had rested, the Court deliberated, then announced its findings and verdict as to all remaining claims and issues. Most of the facts underlying the claims were undisputed; the main dispute was the proper interpretation of those facts.

**Contract Formation**

The Court finds that a contract for 100,000 Smart Clamps was formed between LMS and Hitco, Ltd., and that this contract was formed and in place as of August, of 2011. The key terms were adequately set forth in writing including purchase orders, correspondence (such as Exhibit 259), and other documents.
/ / /

The terms were clear and definite. One order contained pricing errors, but these were explained and all parties knew what was actually intended.

The Court rejected Defendants' argument that a second purchase order from Rubber Fab was either a novation or a replacement contract for the original one. Smith may have intended this, but there was no meeting of the minds between the parties. In particular, Glenn Davis, acting for LMS, did not understand the second purchase order this way, and the Court found Mr. Davis's testimony credible on this point. At most, there was a modification of the agreement, although this was not at issue.

There is evidence of an informal licensing agreement under which Hitco, Ltd. would receive a fee for each Smart Clamp sold. Defendants suggest this meant Hitco, Ltd. was going to "drop out" of the agreement, leaving LMS and Rubber Fab as the parties. But there was no evidence LMS agreed to let Hitco, Ltd. "drop out," and in any event the parties treated Hitco, Ltd. as a party and it continued to participate. Among other things, this was necessary and practical because Hitco, Ltd. held the patent for the Smart Clamp, making its continued active partnership necessary.

The evidence proved that Hitco, Ltd. materially breached the contract by refusing to pay for or take delivery of Smart Clamps after the initial production run. LMS was paid for the units Hitco, Ltd. and Rubber Fab received, but not for the rest of the units in the purchase order. LMS has a number of units still in storage. There was no adequate excuse for Hitco, Ltd.'s failure. Smith suggested that the Smart Clamps LMS had manufactured were defective, but the evidence established the opposite -- LMS manufactured them as Hitco, Ltd. had requested, using Hitco's design and specifications.

As a result of using materials called for in the specifications and problems with the design, the product could not be cleaned with chlorine, and there were a
///

few other problems making it unacceptable to some of the customer base.[1] The Court finds that the problems were attributable to Hitco, Ltd. and not, as Defendants argued, LMS's defective manufacture. The Court therefore finds that LMS has established its breach of contract claim, as to Hitco, Ltd. LMS is entitled to be paid for the Smart Clamps it produced pursuant to the contract, and also to be compensated for its lost profits on the remainder of the 100,000 Smart Clamps Hitco, Ltd. agreed to order.

**Alter Ego**

LMS, motivated by a desire to collect on any judgment against Hitco, Ltd., has claimed that Hitco, Ltd. and Hitco, Inc. operated as alter egos of Smith and of each other. Neither corporation has significant assets. The parties stipulated that, since 2006, Hitco, Ltd. has not made a profit, and Hitco, Inc., since its founding, has never been profitable. The parties also stipulated that both corporations have been unable to pay their own operating expenses and have survived only because of frequent cash infusions from Smith. During the course of the disputes that gave rise to this litigation, and during the litigation itself, Hitco, Ltd. issued a promissory note to Smith, and in payment of that note, transferred the Smart Clamp patent to Smith. If LMS's only recourse is against Hitco, Ltd., Hitco., Ltd.'s debt will go unpaid.

///

---

[1] These problems, it turns out, could be fixed fairly easily. The only remaining problem is that the use of stainless steel means the Smart Clamp cannot be cleaned with chlorine, which is a common practice in the dairy industry. Testimony showed that Rubber Fab is eager to buy Smart Clamps, if it has a reliable supply, and that the main problem with selling the product is the current disruption in the supply caused by Hitco, Ltd.'s dispute with LMS. Although it is not the subject of this lawsuit, it appears both Rubber Fab and LMS stand ready to perform under the contract, and that the Smart Clamp could be profitably manufactured and sold if Hitco, Ltd. and Smith agreed.

These facts, standing alone, do not establish alter ego. Businessmen and businesswomen are permitted to incorporate in order to escape personal liability. *Walkovszky v. Carlton*, 18 N.Y.2d 414, 417 (N.Y. App. 1966). And the mere fact that a plaintiff will otherwise remain unpaid does not constitute the kind of injustice that warrants a finding of alter ego. Additionally, the Court recognizes that there is a presumption against finding alter ego or piercing the corporate veil. *William Passalacqua Builders, Inc. v. Resnick Developers South, Inc.*, 933 F.2d 131, 139 (2d Cir. 1991).

That said, a court may pierce the corporate veil to prevent fraud or achieve equity. *Cortlandt St. Recovery Corp. v. Bonderman*, 31 N.Y.3d 30, 47 (N.Y. App. 2018). New York law allows a finding of alter ego only when both of these conditions are met: (1) The owner completely dominated the corporation and did not treat it as a separate business entity and (2) the owner used his complete control of the corporation to commit a fraud or a dishonest or an unjust act against the plaintiff. *Id.* The factors to be considered include (1) the absence of corporate formalities; (2) inadequate capitalization of the corporation; (3) personal use of corporate funds; (4) commingling of personal funds; (5) overlap in officers, directors and personnel; and (5) using common office space, phone numbers and addresses with other commonly owned corporate entities. *William Passalacqua Builders*, 933 F.2d at 139. All factors are to be considered, and no one factor is dispositive. *Tap Holdings, LLC v. Orix Finance Corp.*, 970 N.Y.S. 2d 178, 183 (N.Y. Supreme Ct. 2013).

Other facts that have been considered and may be relevant here: (1) having no regular meetings, (2) keeping no corporate records or minutes, (3) having no regular elections of directors and officers, (4) having no assets, (5) conducting no business, (6) having no employees, (7) not having its own phone line, and (8) having no income other than funds periodically contributed by defendants to meet periodic obligations. *Ventresca Realty Corp. v. Houlihan*, 838 N.Y.S. 2d 609, 610–

11 (N.Y. Sup. Ct., App. Div., 2007). And all activity designed to drain away a corporation's assets can be considered. *See Grigsby v. Francabandiero*, 58 N.Y.S. 3d 835, 837 (N.Y. Supreme Ct. 2017) (taking "actions calculated to make [an entity] judgment-proof by undercapitalizing [it], and dissolving and thereafter diverting the assets . . . to a new entity" justified piercing the veil). The number of factors in play isn't dispositive. In *Rotella v. Derner*, for example, that an undercapitalized corporation was unable to pay a judgment debt and there was "disregard of corporate formalities and personal use of corporate funds" amounted to sufficient evidence to pierce the corporate veil. 723 N.Y.S.2d 801, 802 (N.Y. Sup. Ct., 2001).

The parties stipulated that Hitco, Ltd. was formed in 1983, and was dissolved in 1988. On August 19, 2011, while Smith (for Hitco, Ltd.) was negotiating with Davis (for LMS), Smith's lawyer explicitly advised him that Hitco, Ltd. had no existence as a corporation, and that any actions he took in its name would be his own. (*See* Ex. 55.) Although Smith testified that he expected Hitco, Ltd. could be reinstated, Hitco, Ltd.'s dissolution wasn't in fact annulled until the following year. Under New York law, the general rule is that contracts entered during its period of dissolution were validated at that time. *See Nigro v. Dwyer*, 438 F. Supp. 2d 229 (S.D. N.Y. 2006). But there is an exception where a defendant acted fraudulently or in bad faith. *Id.* at 236–37. There was no evidence Smith acted fraudulently or in bad faith by allowing Hitco, Ltd.'s corporate status to lapse, and then having it reinstated later. And there is no reason to treat Hitco, Ltd.'s reinstatement or its validation of the contract as ineffective.

At the same time, however, Smith was at the very least very casual about corporate formalities, and apparently untroubled by the possibility that he might be deemed a personal party to the contract. Smith's counsel warned him that, at the time, Hitco, Ltd. was "probably functionally only a Schedule C business activity operated by you personally, and that's a problem both taxwise, and ownership wise for the patents." (Ex. 55.) Had Smith's efforts at having Hitco, Ltd.'s corporate

status reinstated after so many years failed for some reason, he assumed the risk of being personally liable on the contract. There was also the risk of problems with ownership of the Smart Clamp patent, which Hitco, Ltd. had to own in order to make good on its contract with LMS and Rubber Fab. Smith was apparently willing to accept these risks; at the time, he did not disclose Hitco, Ltd.'s dissolution to LMS, and did not make the contract contingent on Hitco, Ltd.'s successful corporate reinstatement.

Although Smith testified confidently regarding Hitco, Ltd.'s status, he had the benefit of hindsight. But at the time he entered into the contract with LMS, he had less reason to be sanguine. His attorney's message, after all, expressed uncertainty, concern, and urgency: "So you still need to get the corporation back into good standing with the Division of Corporation folks, somehow. Did you not talk with the corporate lawyer about this problem?" (Ex. 55.) A later message from Walter Morley (who was involved in the corporations' financial management) similarly warned Smith that Morley had discussed Hitco's status further with the attorney, and "if the corporation was reinstated within two to three weeks that would be fine." (*Id.*) Yet Smith did not act to reinstate Hitco, Ltd. until five months later, on January 30, 2012.

Corporate documents for the two corporations were at best thin. Defendants' own expert testified that when looking at the books and records she found only one set of minutes. She testified that, other than those, she saw no recorded minutes for Hitco, Ltd. or Hitco, Inc. or any evidence at all of director or shareholder meetings. Carol Carrieri, an employee of the two corporations, testified that she thought there was no need for corporate minutes because she and Smith, the two shareholders of Hitco, Ltd., talked about the business daily. Defendants' expert testified that small, closely-held corporations commonly operate this way, though she did not testify whether it was proper or what the consequences were.

///

Part of the problem with this is that, even if Smith's and Carrieri's regular discussions are deemed shareholder or director meetings, the record suggests other directors of Hitco, Ltd. had no notice and didn't participate. Furthermore, Carrieri was not a shareholder of Hitco, Inc.; the other shareholder of that company besides Smith was George Carmichael. There was no mention or record of other corporate formalities, such as notice and annual meeting requirements, having ever been observed.

Based on Smith's and Carrieri's testimony, the Court infers that, not only were no other records of director and annual shareholder meetings ever kept, no other meetings were held. Even important decisions such as the issuance of substantial promissory notes, or authorization of the transfer of both patents from the two corporations to Smith in payment of those notes were never presented to the full board or formally memorialized. In other words, Hitco, Ltd. and Hitco, Inc. appear to have been operated essentially by Smith, in occasional consultation with Carrieri.

Corporate finances and resources were not kept separate vis-a-vis Smith and the corporations. The two corporations shared the same office, equipment, and employees. The testimony suggested that the employees worked for both corporations simultaneously. Hitco, Ltd. paid all salaries and expenses, however, without receiving any corresponding benefit from Hitco, Inc.

Besides making substantial *ad hoc* loans to the corporations, Smith personally guaranteed a Bank of America line of credit for Hitco, Ltd. (Ex. 185.) These activities were apparently carried out without any kind of written agreement or other formalized understanding between Smith and Hitco, Ltd.

The evidence also established that Smith ran a significant number of his personal expenses through the corporations. For one or two years, the corporations made his monthly car payments for him, at $1676 per month. They also paid for maid service for his home, for a phone line in his Florida vacation

home, and some of his personal travel expenses. And Carrieri, while in the office, estimated that she spent 40% of her time handling Smith's personal finances. She testified that she suggested this so that Smith could spend more time focusing on the corporations' business. Yet there was no evidence that either corporation was particularly busy. These were small, closely-held corporations. During the years at issue in this case, the Smart Clamp deal with LMS was the *only* real business either entity engaged in.

Defendants' expert characterized these benefits as perquisites, offered in lieu of salary. Defendants also argued that these occasional benefits represented only a small percentage of the corporations' overall budget. The Court disagrees with these characterizations. These benefits, though not a dominant part of the corporations' budget, were substantial. But the freewheeling manner in which they were conferred is more significant still.

No one who testified for Defendants seemed aware of any regular policy governing which expenses were to be paid, how often or for how long, and what limits there might be. For example, there was no explanation why the corporations started making Smith's Mercedes payments when they did, or why they stopped when they did. Smith seemed to have discretion to charge his personal travel to the corporations. The very general explanation that some of the expenses were business-related was not satisfactory. Rather, all these expenses appear to have been paid on an *ad hoc*, sporadic, and casual basis, without much thought about how helpful they would be to the corporations' business enterprises. This suggests they were not the result of any genuine arm's-length arrangement between Smith and the corporations. Rather, it appears Smith put money into the corporations whenever they ran short, and had them pay his personal expenses when he determined it was convenient. This either amounts to actual commingling of assets or the functional equivalent.

///

10
15cv1852-LAB (BGS)

Because the corporations were S-corporations, Smith could use their losses to offset his personal income. There was no direct evidence that he did claim the tax deduction, but he completed the paperwork to enable him to do this, suggesting that he probably intended to. Under the circumstances, there was no reason why he would not have taken advantage of this offset. Being able to use the corporations in this way was an advantage to him, but not to the corporations. In other words, the evidence suggests he manipulated the corporations for his own tax advantage. Smith's management decisions seem to have been motivated to a significant extent by the desire to personally benefit without bestowing any corresponding benefit on the corporations.

Having considered all the factors, the Court finds that Smith completely dominated both corporations, and that they also functioned as each other's alter egos. By itself, "complete domination" does not justify application of the alter ego doctrine; the arrangement must have been used to commit fraud or another unjust act against the plaintiff. *Cortlandt St. Recovery Corp.,* 31 N.Y.3d at 47. But the "injustice" prong of the test is met too.

One of the effects of Smith's payment arrangements was that he could decide which creditors would be paid. For favored expenses, such as payroll, ordinary costs of operating the businesses, or his own personal expenses, he wrote personal checks to the corporations and those bills were paid. He never asked for a promissory note and none was issued until this litigation was underway. Several of the witnesses differed about whether the payments were intended to be loans or paid-in capital. But after Smith and the corporations were sued, he arranged for the corporations to issue promissory notes in his favor. (Ex. 80, 81.) While the notes *could* have accurately reflected the loans he made to the corporations, no records show what consideration supported those notes. Instead, they include just a bare recital that unspecified valuable consideration was given. / / /

11

15cv1852-LAB (BGS)

Smith also had the power, which he exercised, to withhold contributions that would have been needed to fund payments to LMS.

During this litigation, Smith also arranged for the two patents to be transferred to him, in payment of promissory notes the corporations issued to him during this litigation. Smith testified he did not remember executing on the notes to get the patents. Carrieri testified that she consented to the transfer, because she thought retiring the promissory note would benefit Hitco, Ltd. The Court accepts this as an explanation of what she believed, but there is no convincing evidence Smith also believed this. Also, there is no record whether George Carmichael consented to transfer of the Sani-Lock patent from Hitco, Inc. to Smith.

Even assuming all the shareholders consented to the transfer, there was no evidence the patents were ever valued by a qualified appraiser, or for that matter by anyone. Furthermore, transferring the patents effectively ended the corporations' potential to stay in business. As new owner of the patents, Smith has the power to license them. Transferring the patents meant that the corporations have lost that power, and have nothing to offer Smith to get it back. And, without Smith's consent, Hitco, Ltd. became permanently unable to honor its obligations under the existing contract. This transaction appears to have been in Smith's interest far more than either of the corporations'.

As characterized by all the witnesses including Smith himself, Smith's decisions and actions, when acting on behalf of the corporations appeared to be motivated by what would serve his own interests, rather than theirs. In other words, he seemed to regard the corporations as extensions of himself. For example, he explained decisions in terms of his own personal motivations. In the fall of 2011, he explained, he decided to try to change the terms of the contract so that Rubber Fab would take on more responsibility. He did this, he said, because "I chickened out" and wanted to avoid the possibility of being held "personally responsible" on the purchase order in case something went wrong. His testimony strongly

suggested that he did not approach contract negotiations or other business dealings in terms of what would benefit Hitco, Ltd., the ostensible party to the contract, or in terms of what the board of directors or shareholders thought.

Both corporations were also thinly capitalized and, without Smith's regular loans, they would be insolvent. They had poor credit and few options for raising capital. One of Defendants' theories, for instance, was that LMS was negligent in failing to pull the corporations' credit reports; had LMS done so, they argued, LMS would have seen just how non-creditworthy they were. Smith suggested that they could have sold stock, but under the circumstances it seems unlikely they could have raised much capital, or that there were any potential buyers.

Defendants also argued that capitalization should be measured as of the incorporation date. In the case of Hitco, Ltd., it was unclear whether that would mean the founding date or the reinstatement date. But under New York law, the answer does not appear to matter very much. A corporation can be undercapitalized from the outset, or can have its assets diverted later, rendering it judgment-proof. Regardless of the timing, the fact that a corporation has been *unfairly* rendered judgment-proof seems to be enough. *See Grigsby*, 58 N.Y.S. 3d at 837.

Here, Smith has arranged for both corporations' assets to be transferred to himself in payment for promissory notes he caused to be issued, leaving nothing for LMS to collect against. Had he left the patents in the corporation, LMS and Smith might both have laid claim to them. But by removing them and replacing them with cancelled debt, he has effectively diverted the corporations' assets, making them judgment-proof and benefitting himself at the expense of LMS. Smith also operated Hitco, Ltd. in such a way as to force LMS to unwittingly bear the risk of loss if it breached. The Court finds that this injustice warrants application of the alter ego doctrine.

///

13
15cv1852-LAB (BGS)

To the extent Hitco, Ltd. is liable, both Smith and Hitco, Inc. are also liable as its alter egos.

**Fraud**

LMS's theory is that Smith and, through him, the corporations, misstated material facts and concealed other material facts in order to induce it to enter into the contract, which Smith and the corporations never intended to fulfill. Specifically, LMS presented evidence suggesting that Smith attempted to create the impression that the corporations were robust and busy, when he knew they were thinly-capitalized and almost inactive. LMS also pointed to meetings between its principals and Smith at an exclusive club in Manhattan. It also pointed to misrepresentations on Hitco, Ltd.'s website regarding the corporation's activity, assets, offices, and reach. And it pointed out that neither Smith nor any other representative of the corporations revealed that they were undercapitalized and could not have fulfilled the terms of the contract.

Smith's portrayal of himself as financially successful was, by all accounts, true; he did have a lot of personal wealth. There was no evidence he ever claimed to have made a lot of money through Hitco, Ltd. or Hitco, Inc., or that either of the corporations was wealthy. While LMS pointed to Davis' meeting with Smith at the exclusive Manhattan club, that meeting occurred *after* the contract was formed.

Smith conceded that Hitco, Ltd.'s website (*see* Ex. 40, 41, 43) included some false or inflated information about the corporation's activities, connections, and global reach. For example, the website inaccurately claimed the corporation had offices and manufacturing operations in places in the U.S. and overseas where it didn't, had more employees than it actually did, and was far more active than it actually was. LMS argued that this was held out to the public apparently in a bid to create a more favorable image of Hitco, Ltd. as a company than was warranted.

On the other hand, witnesses for Defendants characterized the two corporations as brokers, which did not need a great deal of capitalization.

According to the witnesses, the corporations (or Smith, acting for them) engaged in arbitrage, matching up manufacturers with buyers. For this reason, they argued, the corporations' lack of substantial assets was not material. The flaw in this reasoning is that neither corporation was merely a broker. Rather, they were both patent holders, whose participation in the deal was necessary. Furthermore, when problems with design and specifications arose, as happened here, they had to be prepared to absorb the costs. In other words, they had to bear the risk that the deal would go somewhat awry, and that what their manufacturer partner (LMS) made and shipped would not be acceptable to their buyer (Rubber Fab) for reasons that neither of those two could be blamed for. In that event, Hitco, Ltd. would have to be prepared to absorb some costs to make things right. Defendants failed to account for this. The misrepresentations on the website were material as to the capacity of Hitco, Ltd. to deal with this risk.

That being said, the only person who steered Davis to the website was John Morton, whose honesty neither side questioned. When Morton testified, the Court had an opportunity to observe his demeanor and found him credible and fair. The Court does not believe he encouraged Davis to look at Hitco, Ltd.'s website in order to deceive Davis. It may have incidentally happened that Davis was misled, but the evidence didn't prove and the Court does not believe this was Morton's intent, nor that Smith commissioned this action.

Furthermore, the misrepresentations on the website do not appear to have resulted in losses to LMS. Hitco, Ltd. breached the contract, apparently because Smith incorrectly or disingenuously blamed LMS for problems with the Smart Clamp. Had Hitco, Ltd. recognized and been willing to accept responsibility for its own errors, the deal likely would have continued. The evidence suggested that if Hitco, Ltd. had been willing to foot the bill for about $30,000 in "fixes" for the Smart Clamps, it would not have breached. The breach is attributable to Smith's decision
///

not to contribute money to Hitco, Ltd. and to direct Hitco, Ltd. not to pay or accept delivery. But there is no reason to believe that was the intention from the start.

The evidence showed that, from the beginning, Defendants intended the deal to be carried out, for LMS to manufacture the Smart Clamps for Rubber Fab to buy them, and for Hitco, Ltd. to pay LMS out of the proceeds. Defendants stood to gain nothing by inducing LMS to enter into a contract which they would then breach. In fact, the breach appears to have hurt the corporations. The motive for breaching, the design and specification problems, was unknown at the start.

Not every injustice rises to the level of fraud. Likewise, not every breach of contract is fraud, and not all misrepresentations or concealment are fraud either. The Court agrees Defendants committed an injustice and made some misrepresentations, but finds that the actions do not rise to the level of fraud.

**Affirmative Defenses**

Defendants asserted statute of limitations and statute of frauds defenses, which are inapplicable to the surviving claim. As discussed above, LMS is suing on a written contract, and filed this lawsuit within the statutory period after the breach.

Defendants' defense of failure to mitigate was not supported by the evidence. Although Defendants suggested LMS should have sold the Smart Clamps it is holding in inventory, it could not legally have done so. The Smart Clamp is a patented device, and LMS can only sell it to the patent holder, or to an authorized buyer, such as Rubber Fab. LMS could not sell them on the open market. LMS's holding the Smart Clamps in storage amounts to reasonable mitigation. They remain useful, and Rubber Fab apparently stands ready to buy them. They can be turned over to Defendants or sold at Defendants' direction. LMS also mitigated damages by not continuing to manufacture Smart Clamps after it was clear they would not be accepted or paid for.

/ / /

**Damages**

LMS's punitive damages claim depended on its fraud claim. Because fraud was not established and there was no other reason to award punitive damages, the Court declines to award them. For similar reasons, LMS is not entitled to an award of attorney's fees.

The Court does, however, find that compensatory damages should be awarded. LMS manufactured some Smart Clamps for which it was never paid. It is also entitled to expectation damages in the form of lost profits on Smart Clamps it contracted to manufacture, which were never made because Defendants breached. LMS is also entitled to prejudgment interest at the statutory rate, which the parties agreed is 10%.

The Court's damages calculations are based largely on Exhibit 196 and the attached schedules, which the Court finds to be accurate. The Court announced its damages calculations on the record, and invited the parties to submit letter briefs if they believed the Court had made an error in calculating them. Neither party has done so.

The Court awards $344,899 for the inventory never paid for, plus 10% interest amounting to $165,344, for a total of $510,243.

The Court accepts the profit valuation of 27%, and awards $516,811 to account for lost profits on the 77,155 units never manufactured. Interest comes to $208,792.

**Conclusion and Order**

The Court finds that Smith; Hitco, Ltd.; and Hitco, Inc. were all each other's alter egos and that Defendants are liable jointly and severally to LMS on the breach of contract claim. In total, the Court awards **$1,235,846.00** in damages and interest to LMS against all Defendants. The Court finds for Defendants on all other claims.

As explained during the announcement of the verdict and judgment, the Court is willing to amend the judgment to award additional interest through the end

of trial, *i.e.*, August 16. But LMS must within ten court days submit a letter brief showing how this is to be calculated, and Defendants may within three court days after that file any objection. Alternatively, the parties can settle this amongst themselves.

Once the entire award is paid, Smith and/or Hitco, Ltd. may take delivery of the unclaimed inventory.

The existing injunction, requiring Smith to hold the patents and not transfer or encumber them, remains in place until Defendants pay the entire judgment, or until Smith is released from his obligation by this Court or another court.

The Clerk is directed to enter judgment for Plaintiff LMS on the breach of contract claim only, against all three Defendants.

**IT IS SO ORDERED**.

Dated: August 31, 2018

*Larry A. Burns*
Hon. Larry Alan Burns
United States District Judge